And good morning. Good morning. I am John Riley with the City of San Diego City Attorney's Office. I represent the city defendants. There's a couple things I'd like to address early on and that is we've heard all different kinds of cases here. Sometimes they refer to these cases as blood and guts cases. What? Blood and guts cases. And we know that a toy gun or whether we call it a replica, we've had tragic situations across the country where people are injured using replicas. In this case, the officers knew right away it was a toy gun. And much of what is alleged here occurred after that knowledge was clear, right? Certainly that's what's alleged, Your Honor. No, I'm just asking you. Is there any question? For purposes of this case, no. There was a report that there were two African American men, blah, blah, blah. They came, a Samoan man, a young man with a gun. Supposedly they checked right away. It turned out it wasn't a real firearm. They knew that. Everything that occurred after that point was with the knowledge that this was a toy gun. There was no real gun. Do you agree with that? For purposes of this case? For purposes of this case here, yes, I do agree with that, Your Honor. But I think we have to take into account we can't just isolate or put in a vacuum what is what we'll call a replica of a gun. As the ER-409 is a picture of that gun, it's far from looking like a gun. Let's assume that's one of the two guns. It turned out to be a toy, a replica, whatever you want to call it. So what was missing was a rifle, right? Correct. Or as the reporting part- That's what they were looking for with all of these searches of these women and children by handcuffing and doing that to see if they had a rifle on them? Well, I think, Your Honor, we really have to take a step back and let's take a look at Sergeant Slush. Sergeant Slush was the individual in charge of this. That's his name, Slush? Slush, S-L-U-S-S. Oh, Slush, you said. Yeah. Sergeant Slush was in charge of this. And we know that Sergeant Slush wasn't just faced with a report of two guns. What he was facing, and I really want to stress the fact that when we look at some of the cases here, cases like Gallego's- You keep saying two guns. The report was a pistol, or a handgun, and a rifle. It was a shotgun. L.Y. African American. Shotgun. Okay. So with all these searches, having identified the smaller gun, he was looking for a rifle. Well, when you get a report, and that's why I was trying to paint the picture, where it's- And we don't use these things loosely, as sometimes we see cliches in cases. This was an apartment complex that just a week before had a call involving Sergeant Slush, where there were people lying in wait with guns. It's an apartment complex that within a year or so before this, someone was shot dead in gang violence. So it wasn't just a call saying, hey, we've got two guns here. What you got is- It was a shotgun and a handgun, as described. And let's take a- Let's really look at that. We get a call- Shot by two blacks and describing their attire. It was described as first a Samoan and a black man. And then that was wrong. The call came in and said, no, it was two blacks. Same phone call, same reporting party. As he's talking to the dispatcher, it's a Samoan and a black. I think it's two black. But my point is, that officer doesn't walk up that dark. And it was dark that night. It's 10 o'clock on a Saturday night in a very dangerous part of town. He does not go up there in isolation thinking, oh, there's only two guns. There could have been knives. There could have been other things going on. What Sergeant Slush's whole intent was, was to figure out what's going on. Now, I mentioned Gallegos, and I did that for a reason. Because there, the court, after one gentleman was handcuffed at gunpoint, put into a car and moved, the court concluded that this investigatory stop worked. It did what it was supposed to. That gentleman was let go. Here, we had at least, well, 15 people that are part of the plaintiffs. We also had a U-shaped apartment complex. He wasn't just mindful of the people in front of him. He's looking to protect not just himself, not just his officers, but people around. Because if gunfire erupts, there's trouble. So he did a commendable job here. What I'm pointing out is, it is not Gallegos. It is not a case where, and the court there, like I said, after a 45-minute detention of one person, found that that was a legitimate detention. It was lawful. But, officer, with respect, excuse me, talking about the officer, this isn't Gallegos. You're dealing with these young men out there, clearly under supervision. They put them down, they handcuffed them, all that sort of thing, after they knew that this was a toy gun. But then they go inside to people from whom, far as I know, there have been no comments, no anything, no threats. And basically, you had women and children who were basically assaulted by these officers and treated as if they were criminals. How do you justify that? Well, the only alleged assault, there's two alleged assaults on excessive use of force. The one is, there was a common complaint that handcuffs were too tight. The other one, unfortunately, and our papers point out that we are not discussing, for purposes of this appeal, the excessive use of force claim to the one gentleman whose shoulder was predisposed to injury, and unfortunately that came about. But, Your Honor, what I'm talking about is, this was 45 minutes, 15 people plus others. You divide that. And, you know, as I said in our papers, it's somewhat speculative. There's some declarations filed with this where plaintiffs said, oh, it was 30 to 40 minutes. But even going with their 30 to 40 minutes, despite a CAD report that shows it's 17 to 25, even going with that, that's about two, two and a half minutes per person to secure the situation. But, again, there was no threat from these other people. There was still one gun unaccounted for. Can you imagine, if you were a young teenager, and you had that happen to you, how traumatic that would be? Well, if that, if something else went wrong, it would have been much more traumatic on everybody's part. And, you know, you can just do this any time you want. There's a gun out there. They're worried about this apartment. And, you know, they've had some crimes there before. Therefore, you can roust out civilians anywhere, any apartment, because you're concerned there might be another gun there. Is that the city's position? This is, and that, this is more than speculative cliches of officer safety. There might be. This was real. And it wasn't just the officer's safety. It was anybody standing in that area. What was the threat? Once you knew, once the officers knew that this was a toy gun, what was the other threat? Was it what my colleagues talked about, a possible shotgun? Possible shotgun? I don't remember seeing them mention that after the initial toy gun was found. Are they saying now that that's what they were looking for, was it the other gun? There was, the initial report was two guns that's... Is that what they said they were looking for? Yes. And more importantly, what started... Where do they say that in the record? I couldn't point to the exact. There was 22 depositions. But your representation is that that's what the officers said they were looking for when they went to this group of 15 roughly people, right? If I could please frame it differently, Officer Schloss was most concerned with making the place secure. A terry stop allows the police to first make it safe. Yeah, in the immediate vicinity, right? Right by the car. I get that. But this was inside in a building and they were having a barbecue. Again, let's put it in the context. It's dark. It's 10 o'clock. There's people yelling. All he wanted to do was secure the situation, make sure that nobody got hurt. And when he was done... He handcuffed all those people for their own safety? He handcuffed them for the police officer's safety and their own. Just picture this, one of those kids not thinking. And it is in the record, Your Honor, that the guy, the kid who had, and I say kid, these were 13 year olds who were over six feet, over 200 pounds. Police came up, they see a gun, it goes out, weapons in hand. That young man purposely in his deposition described, and it's part of the record, put the gun underneath the tire of a car. And as he got down, he said he accidentally kicked it further under the car. That's some consciousness of guilt. The officers are trying to assess this situation. But doesn't the record show that very promptly the officers found, they went to the other side of the car, they found the gun, found it was a toy gun, not a real gun, right? Within a minute. Isn't that correct? That is correct. So after that, all you're talking about is the alleged shotgun that they claim to be looking for. Is that right? That and first securing the situation because people are yelling different versions of what's going on. That's all he wanted to do was secure the area. And as soon as he was able to investigate and say, what is going on? Is that truly a toy gun? Are there other guns? Who are you related? Could he have investigated every single apartment in the complex to secure the situation? No, he didn't have that option. Why couldn't he? If he could go investigate these women and children at a barbecue, why couldn't he go to every single room and say, you know, I think they might have been yelling at me. Let's just be sure the situation is secure. Looking at cases like Gallegos, Washington v. Lambert, Terry Stopp, at some line, there is a line. What's the line? How do you draw a line in a situation like this? You give the officer the ability to use his best judgment based on his experience, based on articulable facts. We have articulable facts here. It's not cliche that this is police And I would like to make the record clear, whether we argue it was 15 seconds, 30 seconds, that was probable cause. Did the probable cause disappear when they found that this was a toy gun? I would say they're given some amount of time to try and ascertain what was really going on. It drops from probable cause at the time the young man who meets the general description that's somewhat vague. He's not the same color and he doesn't have the same clothes on. Well, let's be clear. The record as submitted in the opposing brief says that the clothes did not match. The questioning in the deposition that took place a couple years later to the sergeant was, do you remember what clothes the gentleman had on that evening? He said, I don't. So that doesn't necessarily pin down that the clothes were different, but what you've got is people with a gun. The report, the meat of that report was, we got two people with a gun, they're lying in wait, they're ducking in cars. The police come upon them. Like I said, we know. Three, right? There was three. They had probable cause. Okay, say they did then. Then they find out that this is a toy gun. Do you agree that at that point, probable cause disappears? I would say maybe there's reasonable suspicion. I would give them a minute or so to say, all right. Yeah, but after that, no probable cause. Then we're down to an investigatory detention. Okay, and you're saying that there's this undefined line that permits them to roust about people in the apartment in order to, in quotes, secure the situation, in quotes? They, and this is a key fact, and we're talking articulable facts. There's an admission by one of the deponents, one of the plaintiffs, that she, in spite of the officer when they first arrived, said, we need to see everybody's hands. Everybody freeze where you are. She went back into the apartment. That was commented upon by the officer in his deposition, and it was commented by the appellant. That is a key fact, because- She went because she was afraid, or what? Well, it's the officer's perspective we need to look at, and for them, we've got a missing gun. They're not buying that there's only two guns. They don't know if this is one group moving up on another. We got people in the parking lot gathered at 10 o'clock, so when they see somebody move in, that's a critical fact. How far away was the barbecue from the parking lot? The parking lot and barbecue, if that wall was the sliding glass door of the apartment, there's a little space, and maybe the barbecue is about here, and then the boys coming up are probably- So it's within, certainly, 20 yards, right? Yes. So, you know, I realize we're looking at very intrusive police interference here, police conduct, but when we really look at those cases that outline, there's cases where people have been held over an hour for an investigatory stop. Well, I can give you much worse cases. I can tell you about a case where police came up and shot a boy with a toy gun within two seconds. So that's the worst case, I guess, Chicago or whatever, Cleveland, I don't remember which, but there are worse cases. That doesn't help. Well, that's my point here. This worked. This officer took the time to say what's going on. It didn't work. There was no problem ever. Now, he didn't know that there was no problem ever. He got a report that there was somebody with a rifle or a shotgun and somebody with a handgun, and they found the handgun was a toy gun, and the people weren't the same color. I'm not sure you were saying the people were not the same color? No. Well, as we pointed out, whether you're brown-skinned Hispanic, brown-skinned Samoan, white, dark, African-American, light or dark, when you come up at night, it's definitely dark-skinned people. You have, in a Samoan family... You think if they'd been white people, the same thing would have happened because you couldn't tell the difference between a white and a Samoan, a Samoan and a black. I would think that if you came up in the middle of the night in a gang-infested complex and it was a white person with a gun, same kind of procedures that you need to secure that gun. Even though you'd gotten a call that there were two blacks. Because you have a crime in front of you. A group of whites, you couldn't tell the difference. What you have is a changing dynamic circumstance where you have people in front of you with a gun at night at 10 o'clock. It's not the smartest move to be in a parking lot at night, be it a toy gun or not, because we know that toy guns are used for robberies as well. You know, it seems that there's nothing wrong with being in the parking lot at night. People having a birthday party for a seven-year-old boy. That part is fine. Having a gun and connect that to calls that there's an ambush going on, what's a reasonable officer to do? Find out that there's a toy gun and that there's no shotgun. And how, they never even find out there's no shotgun? That's what... You don't have to handgun people and search them. You don't hide a shotgun inside a child or a woman's dress. The reasonable officer would do more than assume that there's only two guns. There could have been knives, there could have... They don't know what's going on except they have a person with a gun right in front of them. It's matching up. That officer deserves enough time to start thinking it through. Whenever you get a call that there's a person with a gun, that justifies your... If you go down to Wall Street and somebody says, outside the stock exchange, there's a man with a pistol, you could then search all the brokers who are on Wall Street going to work and handcuff them all because you got a call that there's one person with a gun. If you had a group... I'm not saying that's not a good idea. If you had a group of Wall Street brokers who were definitely somehow being moved upon by the person with the gun and there's conversation back and forth and yelling, you would have a certain association of, wow, there's something going on. The brokers over here, no. The people up in the apartments, they didn't handcuff people in the apartments. They were focused on the connection between the folks that were yelling and screaming to one another. But bottom line, you think that what the sergeant did here was commendable? I do, Your Honor. And I would like to point out, when we look at Lambert, Lambert makes clear, when you have a sergeant in charge like that, Washington v. Lambert, the other officers there reasonably relied on his direction. So if there's going to be somebody held accountable, that man is Sergeant Slush. But the other officers were simply relying on his assessment of the situation and at his direction. I heard that in Nuremberg, I think. Well, it's very clear in Washington v. Lambert because those officers, let's look at them realistically. They come upon the scene and say, how can I help? What do I need to do? Because it is a fluid, dynamic situation. They don't have the ability to assess and find out themselves. Let me ask you a purely legal question. I hadn't really thought about this, but when you have two separate claims, one of excessive force and one of false arrest, and you're not contesting for this purpose, for the purpose of qualified immunity, you're not contesting the excessive force claim. Is that right? Well, I would salvage that to some degree because I think it's clear, Your Honor, that the use of handcuffs in this, I believe, was reasonable. How they were applied, I guess that would be, to answer your question, if they're applied in an unreasonable manner, then you would go forward with that claim to a jury. Now, for purposes of qualified immunity appeal, if part of the claim can go forward and you think part of the claim can't, is that the kind of qualified immunity appeal that can be taken for just part of the claim? Yes, because I think the heart of it is that it's an immunity. It's not an affirmative defense, and an officer should not have to stand trial if the... If he's going to stand trial anyway, for some part of it, can you appeal? I'm not asking this out of any knowledge of what the answer is. Do you have any case or any authority? I think I have some, yes, going back to the appeal. I couldn't name you a case per se, but what I can tell you is the idea is not to have the officer stand trial for something that there is an immunity, and when you get into punitive damages and other aspects of measure of culpability to the damage phase, that officer would be prejudiced. I think it also, like I said, the heart and soul of qualified immunity is to government officials, be they police officers or anyone else, acting in an official capacity, should not need to go through a trial if what they did was reasonable, and that is a very high threshold I'd like to remind us that. I think I would like to liken this case to, like, Broussard. It's much like a speeding car chase. It's fluid. It's changing, and the courts have said there is no clear law on what you can and can't do under those circumstances. You have to rely on the circumstances you're facing, your experience. Thank you, counsel. And if I may, a few minutes to rebut. We'll give you two minutes. Thank you, Your Honor. Good morning, Your Honors. Mike Maronin, representing the plaintiffs. I think I should start by saying that I think the district court got this one absolutely right. At the end of the day, the district court said there are factual disputes that preclude summary judgment and qualified immunity. And as I listened, not only at the summary judgment stage, but also at the briefing in this court, and then the argument I just heard, I can't tell the exact percentage, but at least half of the discussion are factual disputes in this case. I mean, I didn't say much during his presentation, but as I understand his argument, if you look at what happened from the perspective of the police officers, they may well have acted reasonably. But that's not what we do. We have to look at this. We have to take all the disputed facts in favor of the plaintiffs and then ask whether a reasonable trier fact could find a Fourth Amendment violation here. Precisely. Precisely. And when you do that, a reasonable fact finder could find a violation. Precisely. That seems to me, that's, you know, if you get into the situation where you're arguing the facts or disputing that when Judge Whalen said there are triable issues of fact and say, no, no, no, he's wrong, there aren't triable issues of fact, we don't have jurisdiction. Precisely. So he's stuck. We have to look at the facts, any disputed fact, we have to take, look at, resolve that fact in favor of the plaintiffs for purposes of making a qualified immunity determination, which is a question of law. Precisely. And I think, I didn't want to leave that unsaid because, as you know, these interlocutory appeals come up often, and especially in a case like this where it is absolutely clear that there are factual disputes, in my view, we shouldn't be here and be... Well, your opponent's not denying that there are factual disputes, but his argument is based on the assumption that all the facts that you are alleging are correct. Well, the first time that was said was at this podium. Well, that's the way that works. Well, I hear you, Your Honor, I hear you on that. And so, even though he doesn't agree with you as to what the facts are, I think his presentation is that, take all of your facts as correct, then even so, what the police did was reasonable. At least for purposes of qualified immunity, a reasonable police officer would not have found that there was anything wrong with what he did, assuming that he did exactly what you say he did. Right. But the only thing I wanted to mention is that, again, that's not the way the case was briefed, and it's frustrating because I have clients who have been delayed in getting their day in court for two years in a case that, in my view, and in Judge Whalen's view, is clearly one where there's factual disputes. But having said that, we're here, and as you know, I briefed all of the, on the merits of the issues, because I think they should be. It's just, as I'm hearing, well, it was dark out there. Well, no, there was light in the parking lot. That's a factual dispute. It was, the people were having a barbecue. I mean, and the police helicopter was up top, and they had radioed to Sergeant Sluss and the others that they see a family having a barbecue. So they know that as they're coming up. And then they come up the driveway, and the first two fellows that they see are a 13-year-old and a 15-year-old, and they don't have anything in their hands. There's no reason, they're not black males, and they get taken down forcefully to the ground. They have a knee in their back, and AR-15s pointed at them. Now, shortly, that seconds later, they find the toy gun. Yeah, I must say, I had a little trouble understanding exactly the sequence of those events. Are you saying that the record, from your standpoint, shows that they first had the first two in custody and being handcuffed and lying down on the ground before they saw the third one with the gun? Yes. That's exactly how it happened. So they come up the driveway, the two, the 13-year-old and the 15-year-old. I thought there were two teams. There were. Two teams of officers. Yes. Yes. This driveway is where one team first encountered people. The other was coming around the other side. So they encounter the 13-year-old and the 15-year-old, who have nothing in their hands, who are not black males. They get taken down on the ground. Then they proceed a short distance, and then they see the kid with the toy gun. I have no problem with them detaining him appropriately. They're investigating. There's nothing wrong with that. The boy immediately drops the gun. And the AR-15 that's pointed at him, the officer says, had he not dropped it, I'd have shot him. So to fault him for dropping it, to me, is inappropriate. But then, literally within a minute, they know that that toy gun, that gun is a toy. Now, what happens to the other two? They get taken to a police car and handcuffed. And they're put in the back of a police car in handcuffs. There's no probable cause to believe they've done anything. And now, if we freeze it for one second, because the officers freezed it at the time, they now have the boy with the gun is now on the ground. They made him crawl out. And they searched him. And so now we know he's not armed. They know that the gun he had is a toy. And now the scene is frozen for a second or a minute or two or whatever. And now the other team is there. So now we have AR-15s and handguns pointed at this family from both sides. And now they start this business of detaining and patting down and searching and then handcuffing 12 more people, including two women and a 13-year-old girl. None of these people, not one of them, matches the description of the suspects. Not one of them has done anything wrong. Is there any reasonable suspicion of criminal activity? Let me ask you this. Your opponent suggests that this was just an extended Terry stop. Do you have any case law that suggests that moving from the three boys, whatever your take on that, to the people that were having the barbecue and so on is not a Terry stop? Is there any case law that backs that up? Or is there this indefinite movable barrier that the officer has to determine at the time based upon the officer's concern about, in quotes, securing the area? Here's the way I analyze that, Your Honor. I don't know that there's a case that says you can extend Terry beyond an individual because it specifically talks about particularized suspicion. It has to be individual suspicion. You can't just say everybody in the bar is a suspect. So to me, the question then goes right back to Terry that says, what was the reasonable suspicion of criminal activity by any one of these people? I think they had a legitimate detention as to the boy with the toy gun. There's no question about that. But now we have these other 12 people. We have admittedly no reasonable suspicion. Once they discovered that the gun that the boy had thrown on the car was a toy gun, did probable cause disappear at that point, or was the fact that someone had seen someone with a shotgun, did that still maintain a high state of suspicion so there would still be probable cause? Well, there's clearly no probable cause to arrest anybody. Because it's not individualized. Right. And that doesn't mean they can't continue to investigate, and I would expect that officers would continue to investigate. But one of the questions is, why are these people treated like criminals rather than like victims? I mean, they were just as likely victims. And look at the way they were treated. And if safety is the issue, first of all, according to the reporting party, there's two black males in that apartment complex, and they're focused on these folks having a barbecue. So what they do is now these people aren't in a place of safety. They're out in the middle, because the officer is making them be out in the middle of the parking lot. They're walking backwards with their hands up, and they're getting patted down. And so the question that the Constitution applies here, the Constitution applies just when there's a gun call, what reasonable suspicion to first detain any of these people? And then the second is, is there any reason to believe any one of them is armed and dangerous, which is required for a pat down? And that's why you have to have the individual suspicion, right? Right, exactly. And you're saying there was no individual suspicion for any members of I'll call them the barbecue party. Right, none. And the officers can't point to any. What they point to is, we've got a bunch of people out there, and we want to search them all to make sure that somebody doesn't have a gun. But then the thing that to me is maybe the most egregious violation is now they've patted these people down. So they've already terrorized them with these AR-15s, and now they're patting them down, and they have nothing on them. And this is all undisputed facts. Then they go about handcuffing them. They have now been determined to be unarmed, and now they handcuff them, including the pregnant woman and the 13-year-old girl, and they go stick them. Now they're all handcuffed, and they go put them at a location where they're obviously not free to leave, and right in the middle of the parking lot. So it's a continued, extended, unconstitutional detention and search. And then we have a total of four, the three boys, and then the one uncle who would get put in police cars. And I think there's a strong argument that a jury. That's the one that had the rotator cuff injury or whatever, a shoulder injury of some kind, right? He didn't go into a car. He was the subject of an officer. He told the officer, I've just had back surgery. You have to be careful. He needed two handcuffs. And they wrench his arm and tear his rotator cuff and his labrum. He's off work for seven months and has surgery. And there's no reasonable suspicion that he's done anything. So I think, I guess at the end of the day, I think that, again, I think Judge Whalen got it right. The factual disputes in this case preclude summary judgment and qualified immunity. And I think it's pretty clear. I don't think on any of these constitutional violations, the law that applies has been clearly established for years. There really is no ambiguity at all. I think it's simply a question of understanding, the officer's understanding, the Constitution still applies. You've got to apply the rules. And you can't just search everybody because it's a dangerous situation. You have to apply the rules that have been set out. Is there a Monell claim in this case? There was, and Judge Whalen dismissed that on summary judgment. Thank you, Your Honor. Okay, we'll give you two minutes. Thank you, Your Honor. And I think counsel did emphasize that safety was an issue, regardless of just his family. He's pointed out that everybody had concerns about being out in the open, and so did the officers. I wanted to stress also that one of the deponents, and it's in the papers, it's in the record, one of the persons there, Junior Seausayo is his name, big man, the family tried for one to two minutes to calm him down. He would not calm down. That's an important factor when we look at the case law, such as Washington v. Lambert, the other cases. Do you have uncooperative suspects? Is Sergeant Schloss going, wait a minute, I got this going on. I got this guy screaming and yelling. I got two guns. I see one. The other things, they didn't handcuff or touch the people who came out on the balconies, but they were mindful of those. He had a lot going on. He took Mr. Seaus, the one whose family admits was uncooperative, put him in the car along with the boys. I was a little uncomfortable with the description of the officers. If you look at the CAD, which is a very objective, not absolute, but gives some objectivity to what was going on, the first command you hear from Sergeant Schloss is, contact made weapons in hand of subjects. So at that point, those three men in the parking lot, we could take plaintiff's facts that it was one, two, three. But the reality is there's three people he says weapons in hand is the first pronouncement, and that was Garrett. So that person probable cause while the other three are going down. The other point I wanted to make was, Justice, I heard the question about could a jury find. And I don't see that as the threshold question here. And in my preparation, it's not in the papers, but it was only in November the Supreme Court, again, commented on a pursuit kind of case. And what they emphasized with respect to qualified immunity, that it has to be beyond a reasonable doubt in these fluid situations, beyond a doubt of debate that the officer acted irresponsible. This is not a case like we see in Sandoval or Lambert, Washington v. Lambert, where there was a total disregard of the law. This was Officer Sergeant Slush in charge of the whole situation, trying his best to do what was right. Thank you. Thank you, counsel. Case to interrogate will be submitted. Court will take a brief recess before the next case. All rise.
judges: Reinhardt, Paez, M. Smith